UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

      v.

BRUCE F. ISRAEL,

              Defendant.

Criminal No. 2:23-cr-20644

Hon. Gershwin A. Drain

---

## UNITED STATES' SENTENCING MEMORANDUM FOR BRUCE F. ISRAEL

For more than half a decade, Defendant Bruce F. Israel (the "Defendant"), co-founder and former majority owner of Asphalt Specialists LLC ("ASI"), cultivated and participated in ASI's bid-rigging conspiracies as the company's most culpable conspirator. The Defendant's extensive participation in these conspiracies enabled ASI to win more than $23.4 million in asphalt paving services contracts, affecting dozens of projects and victims. The Defendant personally rigged numerous bids and often involved others in the bid-rigging schemes, including at least one participant that he managed and supervised in the illegal conduct. The Defendant thus violated the Sherman Act, 15 U.S.C. § 1, corrupting the competitive bidding process and undermining the basic, but essential, notions of free and fair competition.

1

Moreover, by arguing against the application of a three-level adjustment under U.S.S.G. §3B1.1(b), the Defendant has plainly breached his plea agreement, thereby relieving the United States of certain of its corresponding obligations agreed to under the plea agreement. Accordingly, for the reasons set forth in this sentencing memorandum, the United States recommends that the Court impose a term of imprisonment of 30 months, a $617,325 criminal fine payable in full before the 15th day after the date of judgment, a $100 special assessment for each count, and no order of restitution.

## I.     Offense Background

During the charged bid-rigging conspiracies, the Defendant was Vice-President and part-owner of ASI, an asphalt paving company based in Pontiac, Michigan, which provided a range of asphalt paving services, such as large driveways, parking lots, and private roadways. The Defendant shared ownership and the day-to-day management of ASI with his brother, Daniel Israel. The Defendant ran the sales side of the company, doing estimates, pitching customers, and submitting bids while Daniel Israel handled field operations, logistics, and materials. Potential customers seeking asphalt paving services would solicit bids from ASI and other companies, typically requiring bids from at least two or more providers. The potential customer would award contracts for asphalt paving services after first reviewing and evaluating bids submitted by the providers.

2

From at least as early as March 2013 and continuing until at least as late as November 2018, the Defendant and ASI conspired with Al's Asphalt Paving Company, Inc. ("Al's Asphalt") and other co-conspirators to rig bids for contracts to provide asphalt paving services in the State of Michigan. In addition, from at least as early as July 2017 and continuing until at least as late as May 2021, the Defendant and ASI also conspired with F. Allied Construction Company, Inc. ("Allied") and other co-conspirators to rig bids for contracts to provide asphalt paving services in the State of Michigan. The Defendant pleaded guilty to his participation in both conspiracies.[1] Plea Agreement, Dkt. 19.

The two conspiracies operated in much the same way. In furtherance of the respective conspiracies, the Defendant and other officers and employees of ASI engaged in conversations, meetings, and communications with their Al's Asphalt and Allied co-conspirators about which contracts each company wanted to win and agreed to rig bids in each other's favor. The co-conspirators shared price-related information, including bid submissions, so that the agreed-upon losing co-conspirator could craft a higher-priced non-competitive bid, which it then submitted to the customer. As a result, the agreed-upon winning company would indeed get the contract. ASI, Al's Asphalt, and Allied each provided and accepted payments

---

[1] ASI pleaded guilty to two counts of violating Section 1 of the Sherman Act (15 U.S.C. § 1) and was sentenced on August 15, 2024, to a fine of $6,500,000.

for asphalt paving services under contracts obtained through this collusive and non-competitive process.

In his role as ASI's Vice-President and co-owner, the Defendant oversaw the company's business activities and exercised control and authority over ASI's sales team, serving as the "gatekeeper" of the company's sales activities.[2]   But the Defendant's control and authority did not stop at ASI's legitimate business, as he exercised it, at a minimum, over Tim Baugher's illegal, collusive conduct.

The Defendant participated directly in the conspiracies by rigging numerous bids on behalf of ASI.  He also engaged in meetings with co-conspirators from other companies in which the collusive relationships between companies were discussed.[3] The Defendant played a prominent role in these meetings, exhibiting a higher degree of authority than other ASI co-conspirators, including Baugher.[4]

The project referenced in Exhibits 6 and 7 represented a textbook example of the Defendant exercising authority and control over his ASI co-conspirators in rigging a bid with Al's Asphalt and other companies.  The Defendant had a relationship with the project manager, which he leveraged to dictate which

---

[2]  Ex. 1 at 4.

[3]  The Defendant met with co-conspirators from Al's Asphalt, see Ex. 1 at 12-13; Ex. 2 at 5; Ex. 3 at 3, and Allied, see Ex. 1 at 16; Ex. 4 at 14; Ex. 5 at 10.

[4]  For example, during one meeting, the Defendant "chastis[ed]" Al's Asphalt co-conspirator David Coppola about a rigged bid that the Defendant expected ASI to win but that was awarded to Al's Asphalt instead. Ex. 1 at 12-13; see also Ex. 2 at 5; Ex. 3 at 3.

competitors should be on the bidders list.[5]  The Defendant was to be out of town during the bidding, so he emailed Baugher and Daniel Israel, writing, "TIM, you Need to coordinate this while I am gone please."[6]  He then met with Baugher a few days later and emailed Daniel Israel, copying Baugher, about coordinating with competitors to submit non-competitive bids: "Tim and I just spoke. Tell everybody to be NORTH of $580,000" and listed Al's Asphalt and two uncharged co-conspirator companies that he wanted to receive that directive.[7]  Daniel Israel delivered the message to the co-conspirators and ASI ultimately won the project. In other words, the Defendant instructed Baugher to coordinate the bids, and later instructed his own brother to inform three co-conspirator bidders what price should be used for their non-competitive bids.

The Defendant took an even more active role in overseeing Baugher's collusive activities in ASI's conspiracy with Allied.  ASI's main point of contact at Allied was the Vice President of Estimating, Kevin Shell, a former ASI employee. The Defendant and his brother had a frayed relationship with Shell after Shell left ASI, which meant an intermediary was needed for less contentious bid rigging

---

[5]  Ex. 1 at 18-19.
[6]  Ex. 6
[7]  Ex. 7

coordination between the two companies. The Defendant utilized Baugher as this intermediary, instructing Baugher to effectuate ASI's conspiracy with Allied.[8]

The Defendant continued to exercise authority and control over Baugher's participation throughout the duration of ASI's conspiracy with Allied and even after Baugher's promotion to ASI's President in 2019. For example, the project referenced in Exhibit 9 was up for bidding shortly before the end of the conspiracy in 2021. Winning this project was important to the Defendant, who wrote to Baugher that "WE need to for sure lock this one up…."[9] The Defendant took the lead on this project and directed Baugher's communication with the co-conspirator companies, including Allied, to take advantage of Baugher's relationships that the Defendant did not have.[10] Baugher coordinated with Shell so that Allied submitted a comp bid in favor of ASI, and ASI won the project.[11] Despite Baugher's direct coordination with Shell on the project, he contemporaneously represented to Shell that the Defendant was driving ASI's collusion on the project.[12]

Of the Defendant's stipulated volume of commerce of $23,465,114, see Plea Agreement, ¶ 4(c), ASI was paid $10,187,978 for projects that it rigged with Al's

---

[8] See Ex. 8 at 4 (Baugher acted as ASI's liaison to Allied with the Defendant directing Baugher to contact Shell regarding non-competitive bids).
[9] Ex. 9.
[10] See Ex. 8 at 10.
[11] See Ex. 1 at 4-5, 17; Ex. 8 at 9-10.
[12] See Ex. 10 at 3.

6

Asphalt and $3,773,723 for projects that it rigged with Allied.  Moreover, ASI was paid $317,340 for a project that it rigged with both Al's Asphalt and Allied.

The Defendant also engaged in additional, uncharged bid rigging agreements with multiple other companies that provided asphalt paving services.   Of Defendant's stipulated volume of commerce, ASI was paid $9,186,073 for projects affected by uncharged bid-rigging conspiracies.[13]  The projects associated with the uncharged conspiracies occurred during the charged relevant periods.

The Defendant's participation in the charged and uncharged conspiracies affected victims, *i.e.*, customers that paid ASI and its co-conspirators for asphalt paving services projects that were awarded via rigged bids in furtherance of the above-described conspiracies.   The United States has identified 46 such organizational victims.

## II.   The Defendant's Properly Calculated Guidelines Range is 27–33 Months' Imprisonment

In determining and imposing a sentence, the Court must consider the sentence established by the advisory Sentencing Guidelines.   18 U.S.C. §3553(a)(4).  The United States' calculations of the Defendant's offense level and Guidelines fine range is set forth in the following table:

---

[13] The payments derived from the uncharged bid rigging agreements are nonetheless attributable to the Defendant under U.S.S.G. §1B1.3 as relevant conduct.

| Description | U.S.S.G. § | Points |
|---|---|---|
| Base Offense Level | 2R1.1(a) | 12 |
| Conduct Involved Non-competitive Bids | 2R1.1(b)(1) | +1 |
| Volume of Commerce Attributable to the Defendant: $10M – $50M (stipulated to be $23,465,114) | 2R1.1(b)(2)(B) | +4 |
| *Aggravating Factors* | | |
| Role in the Offense | 3B1.1(b) | +3 |
| *Downward Adjustments* | | |
| Acceptance of Responsibility | 3E1.1(a) | -2 |
| **Total Offense Level** | 18 | |
| Guidelines Months of Imprisonment Range, Criminal History Category I | 27 – 33 months | |
| Guidelines Fine Range 1% - 5% of Volume of Commerce | $234,651 – $1,000,000 | |

The above calculation is consistent with Probation's calculation of the Defendant's offense level and Guidelines fine range. See PSR ¶¶ 21-31, 56, 67, and Addendum.

### A. The Defendant's Breach of his Plea Agreement Relieves the United States of its Obligations to Recommend Sentencing Reductions

The Defendant breached his plea agreement by objecting to Probation's application of the three-level manager or supervisor adjustment under U.S.S.G. §3B1.1(b) that he agreed to in his plea agreement. See Plea Agreement, ¶¶ 9, 9(d), 14. Accordingly, the United States exercises its right under the plea agreement to void certain of the obligations it otherwise agreed to, specifically, its agreements (1)

8

to move, pursuant to U.S.S.G. §5K1.1, for a downward departure from the applicable Guidelines imprisonment range (Plea Agreement, ¶¶ 17, 24); and (2) to move for an additional one-level decrease for acceptance of responsibility under U.S.S.G. §3E1.1(b) (Plea Agreement, ¶¶ 9, 10, 24).

> i. The Defendant Agreed in His Plea Agreement to the Applicability of a Three-Level Adjustment Under U.S.S.G. §3B1.1(b)

The Defendant's plea agreement states that "the parties have agreed pursuant to Fed. R. Crim P. 11(c)(1)(B) that certain components of those [Guidelines] calculations—specifically, those set forth above in Paragraph 9—are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed-upon calculations set forth in Paragraph 9." Plea Agreement, ¶ 14.  Paragraph 9 of the Plea Agreement states that the parties agree that certain Sentencing Guidelines provisions apply, including a three-level adjustment under U.S.S.G. §3B1.1(b) for the Defendant's aggravating role as manager or supervisor.  Plea Agreement, ¶ 9, 9(d).

The plea agreement also gave the Defendant notice of the potential consequences if he breached its terms, including empowering the United States to "void any of its obligations" under the agreement.  Plea Agreement, ¶ 24.  Such voidable obligations include moving for a downward departure under U.S.S.G. §5K1.1, see Plea Agreement, ¶ 17 ("It is understood that, should the United States determine that the defendant has violated any provision of this Plea Agreement, such

a determination will release the United States from any obligation to file a motion pursuant to U.S.S.G. §5K1.1 but will not entitle the defendant to withdraw his guilty plea once entered."), or an additional one-level reduction under U.S.S.G. §3E1.1. See Plea Agreement, ¶¶ 9(e), 10.

ii.  The Defendant Knowingly and Voluntarily Entered into His Plea Agreement

There is no doubt that the Defendant understood the plea agreement's terms and knowingly and voluntarily agreed to them. The Defendant was fully represented by former counsel James Mutchnik, Layne Sakwa, and James Howarth when he entered into his plea agreement. The Defendant confirmed in Paragraph 22 of the plea agreement that he reviewed with his attorneys "all legal and factual aspects of this case" and "received satisfactory explanations . . . concerning each paragraph of this Plea Agreement . . ." which necessarily includes Paragraphs 9, 10, 17, and 24. See Plea Agreement, ¶ 22. The Defendant also acknowledged that he "made a knowing and voluntary decision to enter into [the] Plea Agreement." Plea Agreement, ¶ 22. Moreover, in his plea hearing on January 11, 2024, the Defendant confirmed to the Court, under Oath, that he reviewed and understood the plea agreement and its terms. Plea Hearing Tr., Dkt. 21, 14:17-25 - 15:1-8, 17:1-4. The Defendant made that confirmation after the United States had read through the calculation of the base offense level that included the agreement on the aggravating role as manager or supervisor under §3B1.1(b). Plea Hearing Tr., Dkt. 21, 6:8-10.

10

Thus, the record supports the fact that after deliberate consultation with legal counsel, the Defendant understood and agreed to the application of the manager or supervisor adjustment and the potential consequences of reneging on that agreement.

  iii. <u>The Defendant Breached the Plea Agreement</u>

  The Defendant breached the plea agreement by objecting to the application of the three-level adjustment under §3B1.1(b).  "Before declining to honor a term in a plea agreement, the government bears the burden of proving a defendant's breach by a preponderance of the evidence."  <u>United States v. Lukse</u>, 286 F.3d 906, 909 (6th Cir. 2002).

  It is well-established that "plea bargains are essentially contracts." <u>Puckett v. United States</u>, 556 U.S. 129, 137 (2009) (quoting <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 92 (1990)).  "Under our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent." <u>Maples v. Thomas</u>, 565 U.S. 266, 281 (2012) (internal quotation removed).  Here, the Defendant, through his continued objection to agreed-upon Guidelines calculations, has breached the express terms of the plea agreement.

  The plea agreement's explicit terms state that the three-level manager or supervisor adjustment under U.S.S.G. §3B1.1(b) applied to the Defendant's conduct and that taking a position inconsistent with those terms would constitute a breach of the plea agreement.  <u>See</u> <u>Plea Agreement</u> ¶14 (Furthermore . . . the parties have

agreed . . . that certain components of those calculations—specifically, those set forth above in Paragraph 9—are binding on the parties . . .").

On August 5, 2024, the Defendant objected to the Probation Office's application in its Presentence Investigation Report of the three-level adjustment under U.S.S.G. §3B1.1(b).[14]  In that objection, the Defendant stated, multiple times and in a conclusory fashion, that he was not a manager or supervisor.[15]  The objection further stated that "[a]lthough the defense agreed to the terms outlined in the Rule 11 agreement in [Paragraph 58 of the PSR], the defense *no longer agrees* to the 3-point aggravating role enhancement . . . ."[16]

After counsel confirmed that the Defendant would not withdraw his objection, and in accordance with Paragraph 24 of the plea agreement, the United States informed counsel that it deemed the Defendant's objection to be a breach of the plea agreement.[17]  The United States also provided in its letter to counsel notice that it intended to void its agreements to move for sentencing reductions under U.S.S.G. §§ 5K1.1 and 3E1.1(b).[18]

---

[14]  Ex. 11.
[15]  Id.
[16]  Id. (emphasis added).
[17]  Ex. 12.
[18]  Id.

On September 4, 2024, the United States submitted its response and objections to the PSR and the Defendant's objections to the Probation Office.[19]   In that response, the United States provided exhibits and support for the contention that the Defendant was a manager or supervisor.  The United States also noted its position that the Defendant had breached the plea agreement and the consequences that flowed from that breach.[20]

On September 20, 2024, the Defendant replied to the United States' response, and continued to object to the application of the manager or supervisor enhancement and "acknowledge[d] that with different counsel, Mr. Israel agreed to a 3-point enhancement" and that the enhancement was part of the plea agreement and plea hearing.[21]  "Having said that," continued the reply, "Mr. Israel now has different defense counsel who, after reviewing the case, concluded that there was insufficient evidence to support the application of the enhancement."[22]

The Defendant was notified in writing that he was in breach of the plea agreement, pursuant to Paragraph 24 of the plea agreement, and was warned of the specific consequences for doing so.  Yet he continued to object to the agreed-upon terms of the plea agreement.  Such continued objection in the face of express

---

[19]  Ex. 13.
[20]  Id.
[21]  Ex. 14.
[22]  Id.

agreement to the Guidelines calculated in Paragraph 9 constitutes a clear breach of the plea agreement, and the attached exhibits documenting that continued objection prove by a preponderance of the evidence that the Defendant breached the agreement.

      iv.   <u>Defendant's Breach Removes the United States' Obligations To File a 5K1.1 Motion Or Seek a 3E1.1 Reduction</u>

Paragraph 24 of the Defendant's plea agreement expressly provides that if the Defendant violates any provisions in the plea agreement, the United States may void any of its corresponding obligations under the plea agreement.  Here, the Defendant breached the plea agreement by continuing to object to the application of the three-level adjustment under U.S.S.G. §3B1.1(b).  As such, under the terms of the plea agreement, the United States is no longer obligated to file a §5K1.1 motion or seek the reduction of an additional one-level reduction under U.S.S.G. §3E1.1(b).

      v.   <u>The Defendant Should be Held Accountable for His Plea Agreement Breach</u>

The United States' response to the Defendant's breach is entirely appropriate under the terms of the plea agreement[23] and is not premised on any unconstitutional

---

[23] When the government has bargained away its discretion as to whether a §5K1.1 motion is appropriate and instead agreed that it will file a motion, it is "then obligated to make the motion *unless* the defendant breaches the agreement." <u>United States v. Benjamin</u>, 138 F.3d 1069, 1073-74 (6th Cir. 1998) (emphasis added).

or arbitrary basis.[24]   Moreover, these consequences are necessary to uphold the integrity of the plea bargaining process.

It is far from controversial to say that the plea process is a critical part of the criminal justice system.   As the result of that process, the United States and a defendant reach a resolution within the parameters of an agreement that provides a degree of efficiency and predictability that otherwise does not exist in a trial.   But maintaining the integrity of that process does not fall on the United States' shoulders alone.   Indeed, as the Third Circuit explained in United States v. Yusuf, a defendant also must live up to his end of the bargain:

> [A] plea agreement necessarily works both ways. Not only must the government comply with its terms and conditions, but so must [the defendant] . . . [A] defendant should not be permitted to get the benefits of [his] plea bargain, while evading the costs . . . Considering the needs of the criminal justice system generally, we observed that failure to enforce a plea agreement against a breaching defendant . . . would have a corrosive effect on the plea agreement process.   Therefore, when a

---

[24]   The United States has the discretion not to move for an additional one-level reduction under §3E1.1(b) "so long as the decision does not rest on a constitutionally impermissible factor and is not arbitrary."   United States v. Lapsins, 570 F.3d 758, 770 (6th Cir. 2009) (citing Wade v. United States, 504 U.S. 181 (1992)); see also United States v. Coleman, 627 F.3d 205, 215 (6th Cir. 2010) ("The court may show deference to the government's reasons for not seeking a third-level reduction even if the reasons have nothing to do with the timing between the plea and trial, so long as the refusal is not based upon a constitutionally impermissible factor and is not arbitrary.")   Moreover, because the Lapsins Court applied to its §3E1.1 analysis Wade's §5K1.1 reasoning, the United States submits that an analogous §5K1.1 analysis is appropriate here and that it need only prove by a preponderance of the evidence that the Defendant breached the plea agreement in order to void its obligation to file a §3E1.1(b) motion.

> defendant stipulates to a point in a plea agreement, he is not in a position to make . . . arguments [to the contrary].

993 F.3d 167, 176-177 (3d Cir. 2021) (internal citations and quotations omitted) (alterations in original).

The Defendant cannot be allowed to breach the plea agreement while still reaping its full benefits, thereby undermining a process that the parties undertook in good faith. The fact that the Defendant retained new counsel after entering into the plea agreement – a plea agreement the Defendant entered knowingly and with the advice of experienced and sophisticated counsel – does not justify his objection to the previously agreed-upon Guidelines enhancement.

Moreover, rewarding the Defendant for his breach by holding the United States to the agreed-upon benefits for the Defendant poses significant risk to the plea bargaining process that extends well beyond this case. If other criminal defendants see that the Defendant can walk away from his prior agreement without consequence, they may be emboldened to try the same, adding an element of uncertainty to the plea process. This uncertainty must not be allowed.

### B. The Defendant's Guidelines Calculations Should Include the Three-Level Adjustment Because the Defendant was a Manager or Supervisor in the Bid Rigging Schemes

Even if the Defendant had not explicitly agreed that the manager or supervisor adjustment was appropriate, the Defendant's conduct in the bid-rigging conspiracies,

16

standing on its own, requires the application of the adjustment. This is consistent with the Probation Office's assessment, see PSR ¶ 25 (stating that the Defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive"), and is the correct conclusion in this case.

The Defendant was a manager or supervisor of criminal activity that involved five or more participants[25] or was otherwise extensive. U.S.S.G. §3B1.1(b). In the Sixth Circuit, courts consider the following factors in deciding whether to apply the enhancement under §3B1.1: "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." §3B1.1 cmt. n. 4; United States v. Ortiz-Flores, 768 F. App'x 490, 494 (6th Cir. 2019); United States v. Anderson, 795 F.3d 613, 617 (6th Cir. 2015). A defendant does not need to satisfy each factor for the enhancement to be appropriate. United States v. Gates, 461 F.3d 703, 709 (6th Cir. 2006). Rather, a combination of some of these factors

---

[25] A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n. 1. The Plea Agreement stipulates that the charged offenses included five or more participants. Plea Agreement ¶ 4(a)(ii), (b)(ii).

can be sufficient for applying the enhancement.  <u>United States v. Lalonde</u>, 509 F.3d 750, 766 (6th Cir. 2007).  Further, "[t]he key issue is not direct control or ultimate decision-making authority, but rather the defendant's 'relative responsibility.'" <u>United States v. Henley</u>, 360 F.3d 509, 517 (6th Cir. 2004).

   i.   <u>Authority, Control, Planning, and Participation in Offense</u>

The Defendant was directly involved in the bid-rigging conspiracies by soliciting and providing co-conspirators with non-competitive bids as well as managing and supervising the involvement of other co-conspirators at ASI. Although Daniel Israel was President and above the Defendant in ASI's organizational chart, the Defendant was ASI's key figure, the "gatekeeper," regarding sales.  But his authority and control over other ASI employees went beyond just legitimate business, as he channeled this dynamic into the management of others' participation in ASI's bid rigging.  The Defendant, along with Daniel Israel, introduced Baugher to ASI's bid rigging and recruited him into the conduct. He told others at ASI to coordinate with co-conspirator companies so that they submitted non-competitive bids to ensure that ASI would win key contracts.  In doing so, he took advantage of Daniel Israel's and Baugher's relationships with those co-conspirators: Daniel Israel with certain uncharged co-conspirator companies and Baugher with Allied.  And Baugher's promotion to President did little to diminish the Defendant's management of Baugher's collusive activities, as

18

the Defendant continued to delegate to Baugher the role of ASI's primary point of contact for its collusion with Allied.  Such activities demonstrate that the Defendant's relative responsibility in the illegal conduct was greater than other participants as he played an active and managerial/supervisory role over at least one individual's involvement in the bid rigging.

Because the proper focus should be on the Defendant's relative responsibility over others with respect to the bid-rigging conspiracies, it does not matter that Daniel Israel or Baugher exercised a degree of authority carrying out their duties regarding ASI's otherwise legitimate activities such as hiring or operations.  Nor does it matter that ASI and the Defendant were asked by co-conspirators at other companies to submit non-competitive bids in their favor.  Such give-and-take was the nature of the conspiracies and does not change the Defendant's role relative to other ASI co-conspirators.

The Defendant's conduct also meets the "participants" requirement under §3B1.1.  §3B1.1(b) requires that "the criminal activity involved five or more participants or was otherwise extensive," and the Defendant stipulated that the Al's Asphalt and Allied conspiracies each involved at least five participants.  See Plea Agreement ¶¶ 4(a)(ii), (b)(ii).  To qualify for an enhancement under §3B1.1(b), "the defendant must have been the… manager, or supervisor of **one or more** other participants,"—not all five participants.  §3B1.1 cmt. n. 2 (emphasis added); Ortiz-

19

Flores, 768 F. App'x at 495 ("A defendant can be a manager in a conspiracy involving five or more people if he recruits and exercises control over just one person.") (citing United States v. Richards, 508 F. App'x 444, 450 (6th Cir. 2012). The Defendant's management and supervision of Baugher's bid rigging conduct alone satisfies this requirement.   Although there is no dispute that Baugher eventually could and did rig bids independently, the Defendant and Daniel Israel first brought Baugher into the bid-rigging fold, showed him the ropes, and directed certain aspects of his bid-rigging activity.   Thus, the Defendant was not a collaborative co-conspirator on equal footing with Baugher, but rather, he was a manager or supervisor of Baugher's participation in the illegal bid rigging conduct, which makes the three-level adjustment appropriate.

ii.  Fruits of the Offense

Until late 2020, the Defendant owned almost 50% of ASI.  As co-owner, he undoubtedly received through his usual compensation the benefits of the contracts tainted by bid-rigging.  Moreover, in December 2020, the Defendant and Daniel Israel sold around 60% of their equity ownership in ASI and related entities to a private equity fund.  At that time, the Enterprise Value for the sale was $125 million. At least some portion of that value likely encompassed revenue received during the several years of charged and uncharged bid rigging conduct.  As compared to

20

Baugher and other ASI co-conspirators, the Defendant (and Daniel Israel) claimed a larger share of the profits by virtue of his majority ownership of ASI.

The Defendant's role was more than that of a "worker bee" operating at the behest of, or on equal footing with, others to implement ASI's bid-rigging conspiracies. Rather, his conduct was commensurate with a manager or supervisor as contemplated by §3B1.1(b), and the United States agrees with the Probation Department's assessment that the three-level adjustment is appropriate in this case.

## III.   Recommended Sentence

The United States recommends that the Court impose a sentence of 30 months imprisonment and a $617,325 criminal fine. The United States respectfully submits that the recommended sentence is sufficient but not greater than necessary to meet the stated sentencing goals and factors set forth in 18 U.S.C. § 3553(a).

## A. The Recommended Sentence Satisfies 18 U.S.C. § 3553(a)

In addition to considering the Guidelines, the Court must also consider the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet the specified sentencing goals. The most relevant factors include the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence, see 18 U.S.C. § 3553(a)(2)(A)-(B), the nature and circumstances of the offense and the

21

history and characteristics of the Defendant, id. § 3553(a)(1), and the need to avoid unwarranted sentence disparities, id. § 3553(a)(6).   A term of 30 months imprisonment and a $617,325 criminal fine is sufficient, but not greater than necessary, to achieve those objectives.

> i.   Imposing the recommended custodial sentence recognizes the seriousness of the offense and promotes respect for the law

The Defendant's violations of the Sherman Act are serious because they attacked the basic principle of competition integral to our economic system.   Bid rigging is "both an unreasonable restraint of trade and a *per se* violation of the Sherman Act."   See United States v. Dynalectric Co., 861 F.2d 722 (6th Cir. 1988) ("[A]greements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.'); see also id. (quoting Northern Pacific Railway v. United States, 356 U.S. 1 (1958) ("However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.").   Further, as the Sentencing Commission (the "Commission") recognizes, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm."   U.S.S.G. § 2R1.1 cmt. background.

These simple, but important, warnings of the dangers of antitrust violations were echoed by this Court's comments at the recent sentencing hearings in United States v. Timothy Baugher, 2:24-cr-20504 (E.D. Mich.), held on April 16, 2025, and United States v. Daniel L. Israel, 2:23-cr-20538 (E.D. Mich.), held on May 22, 2025. The Court noted that there is "real harm" in bid rigging "because it interferes with fair competition," Baugher Sentencing Tr., Dkt. 36, 25:25-26:1, and that bid rigging "corrupt[s] the bidding process and [ ] affect[s] the fair and free competition that should exist in society." Id. 26:6-8. Moreover, bid rigging's ill effects reach beyond just the paying customer; it "harms consumers and competitors alike." D. Israel Sentencing Tr., Dkt. 40, 46:4-5.

The Defendant's bid-rigging conduct here is no different. The Defendant and his co-conspirators tainted dozens of asphalt paving services contracts, robbing their customers of the benefit of free competition, a basic principle that is integral to our economic system. The Defendant and his ASI co-conspirators reaped the benefits of the charged and uncharged conspiracies to the tune of over $23.4 million in rigged contracts.

The seriousness of the Defendant's conduct cannot be overstated. He was an active and extensive participant in the charged and uncharged conspiracies. He recruited at least one other participant to the conspiracies. He personally sought, received, and provided numerous non-competitive bids to his co-conspirators. He

23

also participated in meetings with co-conspirator executives in which non-competitive bidding was discussed.  Further, his involvement in the conspiracies as Vice-President and part-owner gave his co-conspirators the confidence to collude with ASI knowing that the company was committed to the criminal conspiracies from the top down.

By participating in the charged bid-rigging conspiracies, the Defendant committed a serious violation of law.  That a customer representative may, on occasion, have requested a non-competitive bid is irrelevant.  Bid-rigging is illegal, full-stop.  Furthermore, any such customer representative requests did not comprise the full universe of non-competitive bids that the Defendant sought or provided.  To believe otherwise would ignore the many customers, general contractors, and other project intermediaries who were unaware of the conspiracies and expected the Defendant and his competitors to submit legitimate, competitive bids to win their business.

Similarly, the Defendant's attributable volume of commerce of $23.4 million is significant and cannot be waved away because it may be a relatively small portion of ASI's total revenues or the total money generated in Michigan's asphalt paving industry.  As this Court recognized in D. Israel, even if the approximately $22 million volume of commerce in that case was a "small chunk of the whole big pie, it's still a lot of money and [ASI] and [Daniel Israel] benefited from it."  D. Israel

24

Sentencing Tr., Dkt. 40, 43:1-3. Likewise, the Defendant benefited from over $23.4 million in rigged contracts and must be held accountable for it.

Moreover, the Defendant chose to ignore the real-world impact of his conduct as the harm it caused was self-evident even without the benefit of formal antitrust training. The Defendant was a veteran of the asphalt paving business. He knew right from wrong when it came to dealing truthfully with customers. And he understood the basic notion that, in a free market, competitors must compete and that his coordination with competitors on non-competitive bids corrupted that principle.

Finally, the recommended sentence also promotes respect for the law. As this Court has noted, white-collar criminal defendants seem to "expect better, more lenient treatment than blue-collar defendants." Baugher Sentencing Tr. 27:7-9. This expectation of leniency is at odds with this Court's stated responsibility to create respect for the law and treat all types of defendants the same. See id. 27:2-5. Accordingly, a non-custodial sentence or other significant downward variance here would "reinforce[] the idea that white-collar defendants get more, better treatment and are . . . given a lot of different things than the blue-collar people." See id. 27:10-14. Imposing the recommended custodial sentence would counter this harmful perception and demonstrate that white-collar defendants are not entitled to special consideration, but, in fact, must face judgment by the criminal justice system on the

same playing field as all defendants.  Further, a custodial sentence would underscore the significant role that the Sherman Act serves in our nation's economy and the importance of abiding by it.  Competitive bidding processes, such as the kind that takes place in the asphalt paving industry, rely on competitors to bid honestly and independently.  The recommended custodial sentence reaffirms the importance of keeping this competitive process collusion-free.

Accordingly, the United States' recommended custodial sentence properly accounts for the seriousness of the Defendant's conduct and promotes respect for the law.

ii.  Imposing the recommended custodial sentence on the Defendant provides general deterrence

A custodial sentence of 30 months will provide adequate general deterrence. The threat of imprisonment as a general deterrent is necessary, especially in a case like this one, because bid-rigging is a particularly difficult crime to detect.  Illegal conduct that enriches offenders while minimizing the risk of detection is especially pernicious and requires strong sentences to deter it.  See United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it" (internal citation omitted)). Given the immense effort that it takes to discover and prosecute bid-riggers like the

Defendant, an insufficient penalty may hearten would-be offenders, undermining general deterrence.

Moreover, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) (quoting United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)). Antitrust defendants frequently participate in antitrust conspiracies calculated to boost profits, take shortcuts, and subvert free and open competition. Thus, a more lenient sentence may appear to the average antitrust defendant as merely the cost of doing business and undermine the need for deterrence.

This Court expressed similar concerns about a probationary sentence's effect on general deterrence when it imposed sentences of incarceration in Baugher and D. Israel. The Court noted that a probationary sentence in Baugher may lead someone to think that he could rig bids worth millions of dollars and expect probation, thinking that he could do it "standing on [his] head." Baugher Sentencing Tr. 28:5-8. In D. Israel, the Court recognized that the Michigan paving industry is "big business" with "a lot of temptation for other people to rig bids," and a lenient sentence in that case "wouldn't deter anybody from bid rigging." D. Israel Sentencing Tr. 47:10-18. Adding the prospect of imprisonment to a would-be antitrust defendant's cost-benefit analysis would further the Court's stated goal "to

have people think twice before they break the law" and collude with competitors. Id. at 47:23-24.

A combination of a significant custodial sentence and criminal fine furthers deterrence.  Thus, the United States' recommended sentence serves the need for general deterrence and should be imposed.

### iii. The recommended custodial sentence appropriately reflects the history and characteristics of the Defendant and the nature and circumstances of the offense

The Defendant's net worth is very significant.  PSR ¶ 54.  Given his assets, a sentence of imprisonment will have a far greater impact on him than a monetary fine alone.

Also, based on the information submitted by the Defendant to Probation, the Defendant appears to have grown up in a positive environment and has close familial connections.  PSR ¶ 39.  As an adult, he had a long and very successful career in the asphalt paving industry, working with his brother to develop ASI into a major player. Even with all the benefits afforded to him due to his upbringing and career success, however, the Defendant chose to commit serious felonies that undercut fair and free competition in the industry.

The Defendant both received and provided non-competitive bids as part of bid-rigging conspiracies spanning multiple years.   As a result, the Defendant's company and co-conspirator companies were paid millions of dollars on tainted

contracts.  Given his position, the Defendant could have acted to terminate his and others' involvement in the conspiracies and ceased this criminal activity prior to the end of the relevant period, but he did not.  Instead, the Defendant repeatedly chose to violate the law and directed others to do the same.

The Defendant's breach of his plea agreement also is relevant here because it casts doubt as to whether he fully appreciates the nature and circumstances of what he did to perpetuate the bid-rigging conspiracies.  He and his brother brought Baugher into their preexisting bid-rigging conduct, which had significant ramifications for the company and, given ASI's prominence, the asphalt paving industry because Baugher was hired by ASI with the expectation that he would lead the company in the future.  Even when Baugher ascended to become ASI's President, he still was subject to the Defendant's direction and delegation in furthering the Allied conspiracy.  Thus, the Defendant's management and supervision of Baugher's illegal conduct not only allowed ASI and the Defendant to reap the benefits of bid-rigging over the relevant period, it also set the stage for them to continue doing so for the foreseeable future.  The Defendant's breach demonstrates a failure to fully comprehend his conduct.

Accordingly, the Defendant's personal history and characteristics, as well as the nature and circumstances of the offenses, support the United States' recommended custodial sentence.

iv. <u>Imposing the recommended sentence of imprisonment is consistent with pertinent policy statements regarding antitrust offenders</u>

Pertinent policy statements issued by the Commission support the United States' recommended sentence. The Court should consider these policy statements as a factor under 18 U.S.C. § 3553(a)(5). As previously noted, the Commission recognizes that restrictive agreements like bid-rigging can cause "serious economic harm." U.S.S.G. §2R1.1 cmt. background. Accordingly, the Commission believes that "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of [antitrust] cases that are prosecuted, including all bid-rigging cases." <u>Id.</u> Moreover, the Commission has "concluded that the definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm." U.S.S.G. Ch. 1 Pt. A(4)(d). Similarly, "[s]ubstantial fines are [considered by the Sentencing Commission to be] an essential part of the sentence." U.S.S.G. §2R1.1 cmt. background. The Commission's statements on the imposition of imprisonment and substantial fines for offenders like the Defendant clearly reflect its views that the seriousness of the Defendant's Sherman Act violations justify the United States' recommended sentence in this case.

v.  Imposing the recommended sentence of imprisonment is consistent with the need to avoid unwarranted sentencing disparities

Under 18 U.S.C. § 3553(a)(6), the Court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" A custodial sentence is necessary to address this factor, and the United States' recommended custodial sentence does not create unwarranted sentence disparities.

This Court sentenced the Defendant's ASI co-conspirators Baugher and Daniel Israel each to six months incarceration.  See Baugher, 2:24-cr-20504 (sentence of six months' incarceration and $20,000 fine); D. Israel, 2:23-cr-20538 (sentence of six months' incarceration and $500,000 fine).  A significantly longer sentence of incarceration is warranted for the Defendant for multiple reasons, including: (1) the Defendant's stipulated volume of commerce of over $23.4 million is greater than that of any individual sentenced to date in this investigation and seven to eight times the volume of commerce attributed to the related defendants that the Court previously sentenced to a term of probation;[26] (2) as described above, and

---

[26] The stipulated volume of commerce in Baugher and D. Israel were $17.3 million and $22.3 million, respectively. See also United States v. Edward D. Swanson, 2:23-cr-20699-02 (E.D. Mich. Jun. 6, 2024) (VOC: $3.6 million; sentence of two years' probation and $36,577.48 fine); United States v. David A. Coppola, 2:24-cr-20404 (E.D. Mich. Jan. 31, 2025) (VOC: $3.6 million; sentence of two years' probation and $50,000 fine); United States v. Andrew Foster, 2:23-cr-20381-02 (E.D. Mich. Mar. 18, 2025) (VOC: $3.1 million; sentence of two years' probation and $100,000

despite his breach of the plea agreement, the Defendant acted as a manager or supervisor in the illegal conduct, recruiting and directing other individuals in the bid rigging activity, including Baugher; and (3) as a majority owner of ASI during the relevant period, the Defendant logically profited from the illegal conduct more than any other individual sentenced to date (excepting his brother), including the significant profit the Defendant obtained from the eventual sale of ASI to a private equity company.

Conversely, imposing a non-custodial sentence or a less significant custodial sentence would create an unwarranted sentencing disparity by treating the Defendant, a more culpable individual with further-reaching bid rigging conduct, more favorably than the less culpable individuals already sentenced.

Accordingly, imposing the United States' recommended custodial sentence avoids unwarranted sentencing disparities.

vi.   <u>Balancing the relevant factors, the recommended sentence is sufficient but not greater than necessary to achieve sentencing objectives</u>

The Defendant's illegal conduct was extensive and corrupted the competitive process for multiple years. Accordingly, his sentence must appropriately address the sentencing objectives of § 3553(a). The United States submits that its

---

fine); <u>United States v. Kevin Shell</u>, 2:23-cr-20381-03 (E.D. Mich. May 14, 2025) (VOC: $3.1 million; sentence of two years' probation and $125,000 fine).

recommended sentence of 30 months imprisonment, a $617,325 criminal fine, and a $100 special assessment per count is sufficient but not greater than necessary to achieve those objectives.

## IV.    Defendant does not merit a variance based on age or health

Based on the information provided to Probation, the Defendant has no immediate health concerns or medical needs that the Federal Bureau of Prisons ("BOP") cannot adequately meet. The BOP houses many inmates of similar age and general health and has access to the appropriate resources for both routine and specialist care that the Defendant may need if he is sentenced to a term of incarceration. Thus, the Defendant's age or health does not support a variance or other mitigation.

## V.    Restitution is Discretionary

The Mandatory Victim Restitution Act does not mandate restitution for Title 15 offenses, including the Sherman Act, but only for crimes of violence and certain offenses under Titles 18 and 21. 18 U.S.C. § 3663A(c)(1)(A). Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, the United States has notified the Defendant's victims of these proceedings. The parties have agreed to recommend the Defendant's sentence not include a restitution order. Plea Agreement, ¶ 11.

## VI.   Conclusion

For the foregoing reasons, the United States respectfully requests that the Court: 1) impose a sentence that includes a term of imprisonment of 30 months; 2) order the Defendant to pay a $617,325 criminal fine payable in full within 15 days of the judgment; 3) order the Defendant to pay a $100 special assessment per count; and 4) not order restitution.

Respectfully submitted,

*/s/ Ruben Martinez, Jr.*

Ruben Martinez, Jr. (TX 24052278)
Melanie G. Wegner (IL 6324826)
Allison M. Gorsuch (IL 6329734)
Trial Attorneys

Michael N. Loterstein (IL 6297060)
Assistant Chief

U.S. Department of Justice
Antitrust Division
209 S. LaSalle St. Suite 600
Chicago, Illinois 60604
Tel: 312-984-7200

Dated: June 18, 2025

CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Ruben Martinez, Jr.*
Ruben Martinez, Jr. (TX 24052278)
Trial Attorney
U.S. Dept. of Justice,
Antitrust Division
Chicago Office
209 S. LaSalle, Suite 600
Chicago, IL 60604
312-984-7200
ruben.martinez@usdoj.gov

Dated: June 18, 2025